# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

|  |  |
|---|---|
| **MITSUIYA INDUSTRIES, CO. LTD.,**<br><br>                               *Plaintiffs,*<br>   *v.*<br><br>**FORMED FIBER TECHNOLOGIES, INC.; GISSING TECHNOLOGIES, LLC f/k/a FORMED FIBER TECHNOLOGIES, LLC; GISSING NORTH AMERICA, LLC f/k/a CONFORM GISSING INTERNATIONAL, LLC f/k/a FFT HOLDINGS, LLC; GISSING AUTOMOTIVE SYSTEMS, LLC; GISSING SIDNEY LLC f/k/a FFT SIDNEY LLC; GISSING AUBURN LLC f/k/a FFT AUBURN LLC; CONFORM AUTOMOTIVE, LLC; JOHN DOE ENTITIES AND/OR INDIVIDUALS 1-10,**<br><br>                            *Defendants.* | **CASE NO. 2:20-cv-10941-TGB-TSW**<br><br>**HON. TERRENCE G. BERG** |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT IN PART AND TO STRIKE

FLORENCE ROSTAMI
NEAL HABER
Florence Rostami Law, LLC
Attorneys for Plaintiff
10 Grand Central, 5th Floor
New York, New York 10017
(212) 209-3962
(212) 209-7100 – Fax
*frostami@rostamilaw.com*
*nhaber@rostamilaw.com*
Admitted to U.S. District Court
for the Eastern District of Michigan

JOHN MUCHA, III (P40907)
Dawda, Mann, Mulcahy & Sadler, PLC
Co-Counsel for Plaintiff
39533 Woodward Avenue, Suite 200
Bloomfield Hills, Michigan 48304
(248) 642-3700
(248) 642-7791 – Fax
*jmucha@dmms.com*

RACHEL IZOWER -FADDE
Izower Feldman, LLP
Counsel for Plaintiff
11 Broadway, Suite 615
New York, New York 10004
(646) 448-9011
(646) 304-7071 – Fax
*rizower@izowerfeldman.com*
Admitted to U.S. District Court
for the Eastern District of Michigan

Plaintiff Mitsuiya Industries, Co., Ltd. ("Plaintiff" or "Mitsuiya"), respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss Counts I, IV and V of the First Amended Complaint ("FAC"), to partially dismiss Counts II and III of the FAC, and to strike certain allegations of the FAC.

# **TABLE OF CONTENTS**

INDEX AUTHORITIES ........................................................................... ii

STATEMENT OF ISSUES PRESENTED ........................................... vi

FACTS RELEVANT TO THE MOTION TO DISMISS ...................... 1

ARGUMENT ........................................................................................ 8

    A.    The Paper "Dissolution" Of FFT Inc., Does Not Immunize
    It From Contract Liability (Count I Should Not Be Dismissed) ..... 8

    B.    Counts II and III, Seeking Damages for the Failure of
    FFT Technologies and FFT Holdings to Discuss and Reach
    Agreement on a Royalty Rate for 2016 and Thereafter, Should
    Not Be Dismissed ............................................................................ 11

    C.    Mitsuiya's Claim that It is Contractually Entitled to Audit
    Defendants' Books Under Article 9 of the Agreement Should
    Not Be Dismissed ............................................................................ 18

    D.    FFT Auburn, FFT Sidney and Conform Automotive are Bound
    by the Agreement, the AM and the FAM; Count IV Should Not
    Be Dismissed ................................................................................... 20

    E.    Mitsuiya States a Cognizable Claim of Unjust Enrichment in
    Count V ............................................................................................ 29

    F.    Defendants' Motion to Strike Should Be Denied ......................... 31

    G.    Mitsuiya Should be Granted Leave to Amend .............................. 34

CONCLUSION ..................................................................................... 35

APPENDIX/EXHIBITS

# INDEX OF AUTHORITIES

## Cases

*16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (2013) . 28, 29

*Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671 (E.D. Mich. 2012) ..................... 12, 18

*Arbo v. Tower Group, Inc.*, 2018 Me. Super. LEXIS 198 (Me. Super. Dec. 4, 2018) ....... 27

*Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993).................... 12

*Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996)............................................................ 16

*Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 111–12 (6th Cir. 1989) ................................................................................................................22, 25

*Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)..... 32

*Calhoun Co. v. Blue Cross Blue Shield Michigan*, 297 Mich. App. 1, 17, 824 N.W.2d 202, 211 (2012) ................................................................................................................ 16

*Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426-27, 245 N.W.2d 774, 777 (1976) ...... 31

*Chemtool v. Lubrication Technologies, Inc.*, 148 F.3d 742 746 (7th Cir. 1998)....................... 23

*Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1103-4 (E.D. Mich. 1997)............ 20

*Clark v. Brewer*, 2018 WL 1927384, *10 (E.D. Mich. April 24, 2018) ............................ 33

*Cloud v. Berghuis*, 2007 WL 2363317, *7 (W.D. Mich. Aug. 16, 2007) ........................... 33

*Coastal Ventures v. Alsham Plaza, LLC.*, 1 A.3d 416, 424 (Me. 2010) ............................... 13

*Corthell v. Summit Thread Co.*, 132 Me. 94; 167 A. 79, 81 (1933)...................................... 15

*Daniel G. Lilley Law Office, P.A. v. Flynn*, 2014 Me. Super. LEXIS 73, *9-10 (May 5, 2014) ................................................................................................................ 15

*Dept. of Consumer Indus. Servs. v. Shah*, 236 Mich. App. 381 (1999) ................................ 28

*Dialogo, LLC v. Bauza*, 467 F. Supp. 2d 115, 132 (D. Mass. 2006) ........................... 15,16

*Dinan v. Alpha Networks, Inc.*, 2011 WL 1532309, *4 (D. Me. April 22, 2011) ............. 12

*Estate of Barrows*, 2006 ME 143, ¶ 13, 913 A.2d 608, 611(2006)) .................................. 13

*Flagstar Bank, FSB v. S. Star Capital, LLC*, No. 13-CV-10290, 2014 WL 667966, *4 (E.D. Mich. Feb. 2, 2014) ............................................................................... 23

*Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 522 (6th Cir. 1999) ........................... 34

*Herman v. Mobile Homes Corp.*, 317 Mich. 233 (1947) ..................................................... 28

*House of Providence v. Meyers*, No. 19-CV-13424, 2020 WL 2131800, *19 (E.D. Mich. May 5, 2020) ................................................................................................................ 32

*Ickes v. Nexcare Health Sys., L.L.C.*, 178 F. Supp. 3d 578, 592–93 (E.D. Mich. 2016) .. 24

*In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 698 (Del. 2013) ............................................. 10

*In re. RCS Eng'red Prods. Co.*, 102 F.3d 223, 226-7 (6th Cir. 1996) ................................. 28

*iPayment, Inc. v. Goodrich*, No. CIV.A. CV-05-114, 2005 WL 2713727, *2-3
(Me. Super. July 11, 2005) ................................................................ 22

*Johnson Elec. N. Am., Inc. v. Daimay N. Am. Automotive, Inc.,* 2020 WL 1531727 (E.D.
Mich. Mar. 31, 2020) ........................................................................ 28

*Johnson v. Polaris Sales, Inc.*, 257 F. Supp. 2d 300, 309 (D. Me. 2003) ............................ 18

*Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 741 (6th Cir. 1999) ....................................... 12

*Kittle v. Am.'s Test Kitchen LP*, No. 2:19-CV-11757, 2019 WL 6496596, at *1 (E.D.
Mich. Dec. 3, 2019) .......................................................................... 35

*Kline v. Kline*, 104 Mich. App. 700, 305 N.W.2d 297 (1981) ............................................ 22

*Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704–05
(6th Cir. 1988) ................................................................................ 24

*LePine v. Rosenbaum*, No. 19-CV-12577, 2020 WL 2836275, *12 (E.D. Mich. June 1,
2020) ............................................................................................ 20

*Litton Fin. Printing Div., v. NLRB*, 501 U.S. 190, 207 (1991) .......................................... 18

*Llewellyn-Jones v. Metro Property Grp., LLC*, 22 F. Supp. 3d 760 (E.D. Mich. 2014) ... 1, 29

*Lush v. TERRI AND RUTH F/V, In rem.*, 324 F. Supp. 2d 90, 92–3 (D. Me. 2004) . 15

*Maine Sch. Admin. Dist. No 68 v. Johnson Controls, Inc.*, 222 F. Supp. 2d 50, 53 (D. Me.
2002) ............................................................................................ 18

*Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1221 (Del. 2012) . 16

*Nogueras v. Maisel & Assocs. of Mich.*, 369 N.W.2d 492 ................................................ 28

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 450 F. Supp. 2d 757, 762 (E.D. Mich.
2006) ............................................................................................ 23

*Oldnar Corp. v. Panasonic Corp. of N. Am.*, 766 F. App'x 255, 268 (6th Cir. 2019) .......... 31

*Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011) ..................... 13

*Papo v. Aglo Restaurants,* 149 Mich. App. 285, 302 n. 15 (1986) ..................................... 27

*Pelletier v. Pelletier* 2012 ME 15, ¶ 16, 36 A.3d 903 (Me. 2012) ..................................... 15

*PFS Investments, Inc. v. Imhoff*, No. 11-10142, 2011 WL 1135538, at *8 (E.D. Mich. Mar.
25, 2011) ....................................................................................... 19

*Planet Bingo v. VKGS, LLC,* 900 N.W.2d 680 (Mich. App. 2017) .................................... 31

*S Bay Bos. Mgmt. v. Unite Here, Local 26*, 587 F.3d 35, 43 (1st Cir. 2009) ....................... 19

*Samba Enters., LLC v. iMesh, Inc.*, 2009 WL 705537, *5 (S.D.N.Y. March 19, 2009).... 16

*Seasword v. Hilti, Inc.*, 449 Mich. 542 (1995) ............................................................. 28

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,*
475 F.3d 783, 798 (6th Cir. 2007) ..................................................... 23, 25

*Sherrills v. Wilson*, No. 1:05-CV-310, 2005 WL 1711132, at *1 (W.D. Mich. July 21, 2005) ............................................................................................... 32, 34

*Stanley v. Liberty*, 2015 ME 21, ¶¶ 27-29, 111 A.3d 663, 670 (2015) ............................... 22

*State Police Ass'n of Massachusetts v. C.I.R.*, 125 F.3d 1, 4 (1st Cir. 1997) ....................... 16

*Symyx Techs., Inc. v. Stargate Mobile LLC*, No. 06-12632, 2006 WL 2943301, at *2 (E.D. Mich. Oct. 13, 2006) ...................................................................... 19

*Tobel v. AXA Equitable Live Ins. Co.*, No. 298129, 2012 WL 555801, *7-8 (Mich. Ct. App. Feb. 21, 2012) ........................................................... 21

*Tondreau v. Sherwin-Williams Co.*, 638 A.2d 728, 730 (Me. 1994) ...................................... 12

*Tredit Tire & Wheel Co., Inc. v. Regency Conversions, LLC, et al.*, 636 F. Supp. 2d 598, 601 (E.D. Mich. 2009) ....................................................... 22, 23

*Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457, 461(2000) .... 12

*Wells v. Firestone,* 42 Mich. 641 (1984) ............................................................................. 28

*Wodogaza v. H & R Terminals, Inc.,* 161 Mich. App. 746 (1987) ..................................... 28

*Ypsilanti Cmty. Utilities Auth. v. Meadwestvaco Air Sys., LLC*, 678 F. Supp. 2d 553, 572–74 (E.D. Mich. 2009) ................................................................. 23, 25, 27

## Statutes

10 M.R.S. § 1542 ..................................................................................................... 30

18 U.S.C. § 1836 ..................................................................................................... 30

18 U.S.C. § 1839 ..................................................................................................... vii

6 Del. C. § 9-509 ....................................................................................................... 9

8 Del. C. § 279 ....................................................................................................... 10

8 Del. C. § 280 ....................................................................................................... 10

M.C.L. §445.1901....................................................................................................... 30

## Other Authorities

Arthur Linton Corbin, *Corbin on Contracts* § 532 (1960) .................................................. 16

Restatement (Second) of Contracts § 203 (1981)…………………………………………16

Restatement (Second) of Conflict of Laws § 145 (1971) ………………………………..20

Restatement (Second) of Conflict of Laws § 187 (1971)……………………………………… 11

Wright & Miller, Federal Practice and Procedure: Civil 3d § 1380, 1381..................... 32

**Rules**

Fed. R. Civ. P. 10(b) ............................................................ 33

Fed. R. Civ. P. 12(b)(6) ........................................................ 1

Fed. R. Civ. P. 12(f) ............................................................ 31

Fed. R. Civ. P. 15(a) ........................................................... 34

<u>**STATEMENT OF ISSUES PRESENTED**</u>

**<u>Issue #1</u>**: Does the Tolling Agreement (Section 7) and the First Amendment to the Tolling Agreement (Sections 1 and 3) between Mitsuiya and Defendants provide this Court with jurisdiction to (i) decide whether Formed Fiber Technologies, Inc. ("FFT Inc.") has the capacity to be sued; and in the alternative, (ii) preside over a petition pursuant to *8 Del. C. 279* to form a trust of FFT Inc.'s assets for the purpose of litigating Mitsuiya's claims against this entity?

> **Mitsuiya's Answer: Yes**
> **Defendants' Answer: No**
> **This Court Should Answer: Yes**

**<u>Issue #2</u>**: Does FFT Inc. have the capacity to be sued in this action despite its purported dissolution in December 2013 when in fact FFT Inc. was engaged in business operations on or about April 25, 2019?

> **Mitsuiya's Answer: Yes**
> **Defendants' Answer: No**
> **This Court Should Answer: Yes**

**<u>Issue # 3</u>**: Should this Court deny Gissing Technologies LLC (FFT Technologies) and Gissing North America LLC's (FFT Holdings) move to dismiss Mitsuiya's claims for breach of the Agreed Matters ("AM") and the Revised Agreed Matters ("RAM") based on the failure to negotiate, set and apply a new rate from 2016 and thereafter when there are inherent ambiguities in the AM and the RAM that cannot be resolved on a motion to dismiss since such resolution is the providence of the factfinder?

**Mitsuiya's Answer: Yes**
**Defendants' Answer: No**
**This Court Should Answer: Yes**

**Issue # 4**: Does Mitsuiya's right provided the Agreement to audit of Defendants' books and records (in Article 9) survive termination of the Agreement because this right vested in Mitsuiya prior to the termination of the Agreement?

**Mitsuiya's Answer: Yes**
**Defendants' Answer: No**
**This Court Should Answer: Yes**

**Issue # 5**: Does Mitsuiya plead sufficient facts with the required specificity to support its claim that Gissing Auburn LLC (FFT Auburn), Gissing Sidney LLC (FFT Sidney) and Conform Automotive LLC (DTI) were alter egos of FFT Inc., FFT Technologies, and FFT Holdings, and, therefore, bound by the terms of the Agreement and the AM and the RAM?

**Mitsuiya's Answer: Yes**
**Defendants' Answer: No**
**This Court Should Answer: Yes**

**Issue # 6**: Should this Court deny Defendants' move to dismiss Mitsuiya's claim for unjust enrichment when Defendants' wrongfully benefited from the use of Mitsuiya's "Toyota specific marketing strategies" without compensating Mitsuiya prior to a determination of whether they are trade secret pursuant to M.C.L. §445.1901; 10 M.R.S. § 1542; and/or 18 U.S.C. § 1839?

**Mitsuiya's Answer: Yes**
**Defendants' Answer: No**
**This Court Should Answer: Yes**

**Issue # 7**: Should this Court deny Defendants' motion to strike certain phrases that allege Defendants engaged in fraudulent and deceptive conduct (e.g., misrepresenting and/or concealing material facts) (i) when Mitsuiya has plead numerous allegations that taken together demonstrate that Defendants engaged in such conduct, and (ii) Defendants have failed to present any facts, let alone compelling facts, that demonstrate prejudice,  irrelevancy, or other grounds in support of this move?

> **Mitsuiya's Answer: Yes**
> **Defendants' Answer: No**
> **This Court Should Answer: Yes**

**Issue # 8**: Should this Court deny Defendants' motion to strike the introductory unnumbered paragraphs in the First Amended Complaint since (i) Defendants failed to articulate how they are prejudiced by their inclusion when in fact they are not; and (ii) to the extent that any remedy is required grant leave to Mitsuiya to number these paragraphs?

> **Mitsuiya's Answer: Yes**
> **Defendants' Answer: No**
> **This Court Should Answer: Yes**

**Issue # 9:** Should Mitsuiya be granted leave to amend its pleading if  the Court determines that any claim is not adequately plead with regards to any Defendant?

> **Mitsuiya's Answer: Yes**
> **Defendants' Answer: No**
> **This Court Should Answer: Yes**

**FACTS RELEVANT TO THE MOTION TO DISMISS**[1]

From 1987, Mitsuiya[2] licensed technology to Gates to manufacture parts for Toyota. ¶¶51-3; PgID 330. In 2003, Gates was sold, and the new owners restructured Gates into FFT Technologies and FFT Inc. This division into two entities was not disclosed to Mitsuiya. Mitsuiya understood that FFT Inc. was the sole successor to Gates and therefore, effective May 1, 2004, Mitsuiya entered into a new technical licensing agreement with FFT Inc. ¶¶54-56,58; PgID 330-331. Under Article 2 of the Agreement, Mitsuiya provided Defendants with technology for producing interior liner parts and rear wheel fender liners critical to meeting Toyota standards, along with manufacturing knowhow and other information and technical support necessary for such production ("Technology"). ¶¶57, 89, Ex. A; PgID 331, 340, 457-468. Mitsuiya also provided its proprietary sales and marketing strategies which Defendants used in responding to Toyota's requests for proposals and won contracts. ¶¶41-3, 57, 108; PgID 327-328, 331, 345-346. The Agreement gave Mitsuiya the right to audit FFT Inc.'s books and records (Article 9); confirmed that Mitsuiya was the sole owner of the

---

[1] Facts alleged in the First Amended Complaint ("FAC") must be taken as true for purposes of this Fed. R. Civ. P. 12(b)(6) Motion to Dismiss. "[A] judge may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations." *Llewellyn-Jones v. Metro Prop Group, LLC.*, 22 F. Supp. 3d 760, 777 (E.D. Mich. 2014).

[2] The defined terms used in the FAC are incorporated herein. Definitions are only included where necessary to avoid confusion. References to "¶" and "Ex." are to the corresponding numbered FAC paragraphs and FAC exhibits, respectively. References to "PgID" are to DOC 23 (FAC) PageID numbers.

Technology (Article 10); prohibited the unauthorized assignment, transfer or disclosure of the Technology (Article 12); contained a "no waiver" clause (Article 17); prohibited assignment of rights or obligations without written consent (Article 18); provided that the Agreement was subject to the laws of Maine, without exclusion of its conflict of law principles (Article 19); and prohibited use of the Technology after termination (Article 21). ¶¶90-4, 97; Ex. A; PgID 340-342, 458-458.

In May 2013, four individuals, among them Steven Phillips and William Vaughn who owned DTI, purchased FFT Inc. and FFT Technologies through a newly established entity, FFT Holdings. Phillips and Vaughn, along with Chris Richard and Jon Anderson became the managing executives ("Executives") of the FFT entities and managed these entities from Headquarters at DTI's Bloomfield, Michigan office. Executives did not disclose to Mitsuiya this change in ownership or the existence of FFT Holdings. When Mitsuiya inquired about the acquisition after hearing rumors, Marc Lachance, director of sales of FFT Technologies and FFT Inc., repeatedly represented to Mitsuiya that DTI was simply the new owner, and except for replacing some executives, no other changes were made. ¶¶59-67, 70-72; PgID 331-335.

Soon thereafter, claiming financial hardship, Executives proposed a discount in the past-due royalties owed to Mitsuiya and on future royalties.[3] Over the next months,

---

[3] In a September 2, 2013 letter, Lachance represented that DTI (a/k/a Conform Automotive), and FFT Inc. were one entity and on behalf of this one entity requested a reduction in the royalty rates.  ¶66; PgID 333.

Executives aggressively negotiated a compromise agreement, while engaging in "self-help" and applying pressure on Mitsuiya by withholding all royalty payments. Mitsuiya demanded collateral to support the Executives' promise to pay the 2013 royalty and future royalties owed. In December 2013, while negotiations on the compromise were ongoing, Executives transferred FFT Technologies' assets (its factories in Auburn, Maine and Sidney, Ohio) to two newly formed entities (FFT Auburn and FFT Sidney), and purportedly dissolved FFT Inc. They concealed these changes from Mitsuiya and continued managing all FFT entities and DTI jointly, including viz. dealings with Mitsuiya. At the time, Defendants were $875,000 in arrears on royalty payments to Mitsuiya, and in the first five months of 2014 failed to pay an additional $503,000. ¶¶72-77, 82, 101-103, 115-117, 119; PgID 335-338, 343-344, 347-348.

In February 2014, after months of negotiations, Mitsuiya and Defendants reached a tentative agreement whereby in exchange for forgiving all delinquent amounts for 6 months, Defendants would pay three percent (3%) rate for all Toyota models including those for which they were paying two percent (2%) in 2014 and 2015, go back to Table 1 rates from February 2016 and provide collateral if Mitsuiya required it. In March 2014, despite Mitsuiya's continued good faith negotiations, Executives refused to provide the collateral Mitsuiya had continually requested, claiming that their banks would not allow Mitsuiya to have a junior secured creditor position in FFT Inc.'s assets. Unbeknownst to Mitsuiya, the real reason for their refusal was that *neither FFT Inc. nor FFT Technologies owned the Auburn and Sidney factories*. On May 1, 2014, the Agreement was

automatically renewed (Ex. A; PgID 464) and with it the representation that FFT Inc. was a "corporation incorporated and ***existing*** under the laws of state of Delaware," which was false. ¶¶119-120, 126, 316; PgID 348-349, 351, 406.

Throughout the negotiations, Executives and their subordinates continually held Defendants out as a single entity, named FFT Inc., on whose behalf they were negotiating. Throughout the negotiations, Mitsuiya consistently and unequivocally communicated that any accommodation would be limited in duration, after which the royalty rates would revert to those set in Table 1 or higher; Defendants understood that these were Mitsuiya's conditions. ¶¶120-129; PgID 349-352.

Negotiations finally concluded on June 11, 2014, when Richard and Lachance met with Mitsuiya's president in Japan and negotiated a resolution to the arrearages and a reduced royalty rate for a limited period. Richard and Lachance represented that they were negotiating on behalf of the entity they held out as FFT Inc.; that FFT Inc. would abide by the payment terms and the term requiring negotiating and setting a new rate to be effective from January 1, 2016. Such representations were false. Richard and Lachance demanded that an agreement be executed immediately, and at their insistence and in reliance on their representations, Mitsuiya prepared and executed the Agreed Matters ("AM"). Within days, through Lachance, Executives demanded that Mitsuiya execute a Revised AM ("RAM") with what he stated were "minor changes or additions to the language, but the spirit of the [AM] is just as we discussed in Japan last week" which was false since those changes, including switching the contracting party from

FFT Inc. to FFT Technologies were material.[4] Based on that representation, Mitsuiya executed the RAM. ¶¶130, 133-134, 136-138, Exs. B, C; PgID 352-354, 470-471.

The AM and RAM forgave part of the arrears, set a payment schedule for the remainder of the arrears, and reduced the royalty rate to one percent (1%) of sales revenue on products manufactured using the Technology between January 1, 2014 and December 31, 2015. By agreeing to these terms, Mitsuiya gave up more than $1.7 million that it was indisputably entitled to under the Agreement. In exchange, under both the AM and RAM, the discounted rate was limited to two years; the parties agreed to set and apply new rates for 2016 and thereafter (with full intent that such rates would be paid). The concessions were made retrospectively invalid in the event of any default including failure to negotiate and set a new royalty rate for 2016 and thereafter. Unlike the AM, the RAM provided that Table 1 to the Agreement was no longer in force—a term Defendants had slipped in as a "minor change." ¶151, Exs. B and C; PgID 358, 470-471, 473-474.

To further reinforce the image that DTI and Formed Fiber Technologies were combined into one entity, in 2015, Executives changed DTI's name to Conform Automotive (¶8; PgID 315), and publicly announced that DTI and Formed Fiber Technologies were being "combined under common ownership and management as

---

[4]  The AM contained all essential terms of the accommodation—there was no need for a revised agreement, except that Executives desired to surreptitiously establish new provisions against Mitsuiya's interests.

we are renamed "ConForm Automotive" an entity "derived through an acquisition of [FFT Technologies] by the partners of [DTI]." ¶¶68-9, 322, 325; PgID 333-334, 407-408. Executives then registered and/or used "Conform" as the trade name for FFT Technologies, FFT Auburn, FFT Sidney and Conform Automotive. *Id.* Before then, Defendants' email communications with Mitsuiya either did not identify the entity or were signed as "Formed Fiber Technologies" or "Formed Fiber Technologies Inc."; and then from 2015, as "Conform Automotive." ¶¶124, 326; PgID 334, 409.

In November 2015, Mitsuiya wrote to Vaughn that the reduced royalty rate ended after December 2015, and to commence negotiation of the 2016 rate, as required by the AM and the RAM.[5] Defendants breached their obligations to negotiate and set a rate for 2016 first by proposing a lowball offer, made in November 2015, which included a term that would allow Defendants to use Technology without any payment after a period of three years (which terms they knew were unacceptable to Mitsuiya); and thereafter, in essence, *by refusing to negotiate, claiming that they could not negotiate until after* "*a potential financial restructuring of the current equity among the four owners*." Defendants unilaterally elected to pay royalties at the rate which had expired on December 31, 2015 and stopped paying for March and April 2017. Because Executives had continually refused to discuss royalty rates for 2016 and beyond, on October 21, 2016, Mitsuiya

---

[5] Mitsuiya informed the Executives as early as December 2014 that, in line with its expectation as communicated to Executives prior to executing the AM and RAM, Mitsuiya intended to demand that the Table 1 royalty rates be reinstated after the two year accommodation period.  ¶152; PgID 359.

notified FFT Inc. that it was in breach of the agreements between the parties and demanded payment of additional royalties for January through October 2016.  ¶¶155, 157, 159-165, 178, 193, 195; PgID 359-365, 370.

Rather than working on "revision of the equity arrangement among the four owners," Defendants were actually in the final stages of selling Conform, FFT Holdings, and its subsidiaries; that sale closed on or about October 31, 2016 but was not disclosed to Mitsuiya until November 14, 2016.  It was subsequently revealed that the buyer was Defendant Gissing Automotive. Claudio Calado—who had been identified as the investment banker on the transaction—was installed as chief executive officer of that entity, as well as for the other Defendants then in existence. Thereafter, Defendants operated the entities acquired by Gissing Automotive as a single, integrated enterprise, blurring the lines between them, and utilizing the Technology for their business purposes without Mitsuiya's consent. ¶¶68-69, 79-81, 164, 179-181, 310-311, 325-329; PgID 334-335, 337, 363, 367, 404-405, 408-410.

Even after the sale to Gissing Automotive, Defendants continued their refusal to negotiate the royalty rate. Instead, in a letter dated January 24, 2017, Sean Fitzgerald demanded that the Agreement be terminated immediately "for cause" based on a trumped-up claim that Mitsuiya had breached the Agreement by failing to provide certain technology for a Toyota model (Highlander) which Defendants had no contractual obligation to provide. When Mitsuiya responded that this claim was specious, Fitzgerald, on February 13, 2017 on behalf of FFT Holdings as a purported

successor in interest to FFT Inc., notified Mitsuiya that pursuant to Article 13, his client

would not renew the Agreement.  Prior to this letter, Defendants had not informed

Mitsuiya that the Agreement was assigned from FFT Inc. to FFT Holdings. On March

9, 2017, Mitsuiya acknowledged the termination would be effective April 30, 2017, but

reiterated its position that Defendants had breached their obligations and were liable to

Mitsuiya for the difference between royalties paid and the royalty rates set forth in Table

1 of the Agreement.  ¶¶182, 185-193; PgID 367-370.

Since the April 30, 2017 termination, Defendants have misappropriated the

Technology and wrongly continued to use Mitsuiya's marketing strategies and sales

knowhow in violation of the Agreement, the AM and the RAM, without permission

and without compensating Mitsuiya and in violation of federal and state statutes that

protect trade secrets such as Mitsuiya's Technology.  ¶¶197-218; PgID 371-375.

Based on the above well-pled facts, which must be taken as true, the FAC states

plausible claims for relief on each of the causes of action.  Further, none of the

statements to which Defendants object are "redundant, immaterial, impertinent, or

scandalous" so as to warrant the Court to strike them under Fed. R. Civ. P. 12(f).

## ARGUMENT

## A.   The Paper "Dissolution" Of FFT Inc., Does Not Immunize It From Contract Liability (Count I Should Not Be Dismissed)

Defendants contend that pursuant to Delaware law, FFT Inc. cannot be sued for

breaching its obligations under the Agreement and the AM because of its dissolution

on December 31, 2013. Defendants' Brief in Support of Motion to Dismiss ("MTD"); PgID 500. This argument is flawed: (i) FFT Inc. was engaged in business operations in 2019, well after its supposed dissolution; and (ii) since Defendants never informed Mitsuiya of the dissolution of FFT Inc. (Mitsuiya had no knowledge of its dissolution) and Defendants did not seek or obtain consent to transfer the Agreement, AM and/or RAM to FFT Holdings (the purported successors of FFT Inc.), Delaware law provides Mitsuiya with the right to maintain its claims against FFT Inc. and to petition this Court to collect and hold in trust FFT Inc.'s assets until the resolution of this action, which would be timely.

In 2014, Defendants affirmatively represented to Mitsuiya that FFT Inc. remained in existence; the AM was executed in June 2014 in its name.  On April 25, 2019, a financing statement was filed with the Delaware Secretary of State, attesting that FFT Inc. along with FFT Holdings, FFT Technologies, and FFT Sidney secured equipment lease financing from Advanced Engineering Solutions, Inc. ("Creditor"), thereby confirming FFT Inc.'s existence.[6] ¶¶ 2, 81, 105-106, 221, 318; PgID 312, 337-338, 344-345, 375-376, 406; *DOC 1, ¶ 80 (Complaint)*; PgID 29; MTD Ex. A; PgID 524-525. MTD Ex. A; PgID 524-525. Defendants would have this Court blithely accept their assertion that the financing statement was filed by mistake and that the termination

---

[6] A filer faces substantial liability for filing a financing statement without the debtor authorizing the filing in an authenticated record or executing a security agreement; thus, it is reasonable to presume that such a security agreement by FFT Inc. existed as a predicate for the UCC filing.  6 Del. C. § 9-509

they have secured indisputably evidences a mistaken filing. MTD, PgID 503-504. Nothing in the documents proffered by Defendants (MTD Ex. B; PgID 529-531) evidences that the initial filing against FFT, Inc. was a mistake or proves the reason(s) the Creditor filed or withdrew the financing statement. The fact that it took Defendants nearly two months after the Complaint was filed to obtain this termination simply raises more questions of fact.

Further, nothing in Delaware law provides that a claimant cannot assert claims against a dissolved entity. Even if FFT Inc. does not have the capacity to be sued, since Executives or other agents or representatives of FFT Inc. failed to give Mitsuiya (a known creditor of FFT Inc. (¶175, PgID 365) the notice required by the Delaware Corporations Act, 8 Del. C. § 280, Mitsuiya has the right, pursuant to 8 Del C. § 279, to petition this Court for formation of a trust to collect FFT Inc.'s assets until the conclusion of this Action, from which a judgment for Mitsuiya can be discharged. Delaware law imposes a ten year time limit for imposition of such a trust.[7]

Defendants further argue that this Court does not have jurisdiction to decide FFT Inc.'s capacity to be sued since Mitsuiya did not seek relief in the Delaware Court of Chancery. MTD, PgID 500-501. However, pursuant to a Tolling Agreement (Section 7) and the First Amendment to the Tolling Agreement (Sections 1 and 3)("TA")

---

[7] 8 Del. C. §280; *In re Krafft-Murphy Co., Inc.*, 82 A.3d 696, 698 (Del. 2013) ("[A]a dissolved corporation may act only through a receiver or trustee appointed under 8 Del. C. § 279."). Mitsuiya shall petition for formation of the trust if necessary.

between Mitsuiya and Defendants, annexed hereto as Exhibit A, FFT Inc. and its affiliated entities (viz. "all parent companies, subsidiary companies, holding companies, affiliates, corporate predecessors or corporate successors") subjected itself to the jurisdiction of this Court with respect to all claims arising from the Agreement. ¶¶ 19-21, 23-24; PgID 318-321. Therefore, the TA entered into by Defendants' counsel, on behalf of FFT Inc. as a subsidiary and corporate predecessor of FFT Holdings, subjected FFT Inc. to the jurisdiction of this Court on all matters, including the establishment of a trust under Delaware law.

B. **Counts II and III, Seeking Damages for the Failure of FFT Technologies and FFT Holdings to Discuss and Reach Agreement on a Royalty Rate for 2016 and Thereafter, Should Not Be Dismissed**

Defendants concede that the Agreement, the AM and the RAM (DOC 23, Exs. B and C; PgID 470-474) are enforceable as to FFT Technologies and FFT Holdings, but argue that as a matter of law, they did not breach the AM and RAM because those agreements solely required them to "discuss" royalties for use of the Technology for 2016 and thereafter; that Defendants "discussed" the 2016 rate; and that absent a new agreement, Defendants could continue to apply the discounted rate from January 1, 2016. Defendants' arguments are meritless.

First, by its terms, the Agreement is subject to Maine law. DOC 23 Ex. A, PgID 465. Restatement (Second) of Conflict of Laws § 187 (1971) provides: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit

11

provision in their agreement directed to that issue." Michigan has adopted the approach set forth in the Restatement (Second) of Conflict of Laws. *Banek Inc. v. Yogurt Ventures, U.S.A., Inc.*, 6 F.3d 357, 361 (6th Cir. 1993). Michigan's choice of law rules governing contract actions have also been applied to the quasi-contractual claim of unjust enrichment. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 741 (6th Cir. 1999). Thus, Maine law applies to Mitsuiya's breach of contract and unjust enrichment claims.

Second, under Maine law, it is the province of the factfinder to interpret ambiguous or missing terms. *Tondreau v. Sherwin-Williams Co.*, 638 A.2d 728, 730 (Me. 1994). See also *Dinan v. Alpha Networks, Inc.*, 2011 WL 1532309, *4 (D. Me. April 22, 2011); *Villas by the Sea Owners Ass'n v. Garrity*, 2000 ME 48, ¶ 9, 748 A.2d 457, 461 (2000). It is also well settled in the Sixth Circuit that where a contract is ambiguous and the parties disagree on the meaning of its provisions, it is improper to dismiss the claim at the pleadings stage of the case on a Rule 12(b)(6) motion. *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671 (E.D. Mich. 2012).

The AM and RAM terms are ambiguous. If interpreted literally, as advocated by Defendants, the RAM's reduced rate provision is not effective and enforceable from June 27, 2014. The first clause of Section 2 of RAM provides: "Mitsuiya agreed that retrospectively from January 2014 until December 2015, royalty rate set out in Art. 3 of [the Agreement] will be amended and replaced to (one Percent) 1% …." Table 1 set forth the rates referenced in Article 3. DOC 23, Ex A.; PgID 467. However, the last clause in Section 2 (expressly included by Defendants) provides: "Table 1 of the

[Agreement] *is* no longer of any force and effect." A literal interpretation of this clause—the word "is"—can only mean that Table 1 was of no force and effect as of June 27, 2014; thus, Defendants were not entitled to the reduced rate provided in the first clause from that day since that clause defined the reduced rate as an amendment of Table 1 and not as an independent term. Further, if we accept Defendants' literal interpretation, there was no effective mechanism to set and apply a rate between parties from June 27, 2014 or January 1, 2016, which as explained below, was contrary to the parties' intent. The ambiguities in the AM and the RAM cannot be decided as a matter of law on a motion to dismiss; thus, Mitsuiya's breach of contract claims against FFT Technologies and FFT Holdings (and FFT Inc.) cannot be dismissed at this juncture.

Third, Maine courts construe contracts in accordance with the parties' express and implied intent discernable from the contract language, motive, purpose of making the agreement, and objective to be accomplished. As stated in *Coastal Ventures v. Alsham Plaza, LLC.*, 1 A.3d 416, 424 (Me. 2010). "It is a well established principle that a contract is to be interpreted to give effect to the intention of the parties as reflected in the written instrument, construed in respect to the subject matter, motive and purpose of making the agreement, and the object to be accomplished." (quoting *Estate of Barrows,* 2006 ME 143, ¶ 13, 913 A.2d 608, 611(2006))(quotations and citation omitted). See *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011)("Courts must review the entire contract and [p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as

manifested thereby.")(quotations and citation omitted).

This Court should look to the Agreement, as well as the AM and the RAM, to discern the parties' intent. Throughout their relationship, parties intended to set applicable rates *prior to* provision and use of Technology. For nearly three decades, when it first provided the Technology to Gates and as established in the 2004 Agreement, Mitsuiya was contractually entitled to and demanded precise royalty rate terms. Table 1 set forth rates for certain models and expressly provided that licensing of technology for new models will be subject to agreement on a royalty rate. If the Agreement did not set forth a royalty rate for a particular model, the parties were obligated to discuss *and agree on a royalty rate to be paid* for that model as a condition of provision and use of Technology. The AM and the RAM expressly and unequivocally provided that the royalty rate of one percent (1%) *solely* applied to 2014 and 2015. Since Defendants' own term in the RAM rendered Table 1 of no force and effect, as of January 1, 2016 (arguably as of June 27, 2014), accepting Defendants' interpretation of the clause to "discuss" without an obligation to fix and pay a new rate would result in the absence of an agreed-upon mechanism to set a royalty rate, contrary to the parties' well established history and intent to set and pay express new rates. Moreover, in the extensive negotiations over the course of nearly one year prior to and on June 11, 2014, Mitsuiya clearly communicated its intent (¶¶120-129; PgID 349-352) to provide a concession rate only for a limited period of time, and set rates for 2016 in line with Table 1, which Defendants *clearly understood and agreed to* in exchange for the accommodations in the AM

and RAM. ¶ 152; PgID 359. Consequently, the parties could only have intended that the provision of AM and RAM to discuss the 2016 rates required them *to negotiate and set a new rate for 2016, to be paid to Mitsuiya*. That new royalty rates were to be set and paid was never in doubt, but it now it is the providence of the factfinder to supply the missing rates amount.

Fourth, Maine law provides that in an otherwise enforceable agreement, the court can determine a reasonable price to be applied. As stated by the Maine Supreme Judicial Court nearly a century ago: "If the contract makes no statement as to the price to be paid, the law invokes the standard of reasonableness, and the fair value of the services or property is recoverable." *Corthell v. Summit Thread Co.*, 132 Me. 94; 167 A. 79, 81 (1933) This principle has been recognized and applied ever since. *Pelletier v. Pelletier* 2012 ME 15, ¶ 16, 36 A.3d 903 (Me. 2012); *Daniel G. Lilley Law Office, P.A. v. Flynn*, 2014 Me. Super. LEXIS 73, *9-10 (May 5, 2014); *Lush v. TERRI AND RUTH F/V, In rem.*, 324 F. Supp. 2d 90, 92–3 (D. Me. 2004)("Under Maine law, a court can supply reasonable terms to a contract so long as there is a mutual assent to an agreement that contains terms that enable the court to allocate liability. In the Restatement's words, the actions of the parties may show conclusively that they have intended to conclude a binding agreement, even though one or more terms are missing or are left to be agreed upon. In such cases, courts endeavor, if possible, to attach a sufficiently definite meaning to the bargain.")(quotations and citations omitted). See also *Dialogo, LLC v.*

*Bauza*, 467 F. Supp. 2d 115, 132 (D. Mass. 2006)(applying Maine law).[8]

Fifth, under Maine law, a contract cannot be interpreted in a manner that will be commercially unreasonable, absurd, and/or unfair. "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." Restatement (Second) of Contracts § 203 (1981). As the First Circuit stated in *State Police Ass'n of Massachusetts v. C.I.R.*, 125 F.3d 1, 4 (1st Cir. 1997):

> The law, in turn, should be reluctant to insist that courts construe a document in a way that leads to an absurd or nonsensical result. Indeed, the maxim *ut res magis valeat quam pereat* teaches that a written instrument ordinarily should be given a meaning that will make it legally functional rather than a meaning which will render it legally dysfunctional. *See* 3 Arthur Linton Corbin, *Corbin on Contracts* § 532 (1960); *see also Blackie v. Maine*, 75 F.3d 716, 722 (1st Cir. 1996).

Also see *Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, 68 A.3d 1208, 1221 (Del. 2012), as corrected (July 12, 2012)("Interpretation cannot result in absurd, commercially unreasonable or unfair interpretation."); *Samba Enters., LLC v. iMesh, Inc.,* 2009 WL 705537, *5 (S.D.N.Y. March 19, 2009)(interpretation cannot results in commercially unreasonable terms or terms contrary to the reasonable expectations of the parties).

---

[8] This contract principle is also recognized by Michigan courts.  See *Calhoun Co. v. Blue Cross Blue Shield Michigan*, 297 Mich. App. 1, 17, 824 N.W.2d 202, 211 (2012) ("[W]e first look to the language of the parties' agreement. In doing so, we also remain cognizant of what we recognized earlier, which is that our courts do not look favorably on arguments that a contract cannot be enforced because of the indefiniteness of a term. This sound rule is premised in part on the principle that parties to contracts should not be readily able to evade their obligations using after-the-fact assertions of indefiniteness.")(citations omitted).

Defendants' interpretation of the term "discuss" leads to an unreasonable, absurd and unfair conclusion that the AM and RAM enabled them to unilaterally determine the royalty rate they would pay without any legal obligation to obtain Mitsuiya's consent while Defendants had in their possession and were able to use the Technology over which Mitsuiya's had no control—as they did after the termination of the Agreement. Further, neither the AM nor the RAM provides Defendants with the right to choose the rate for their use of the Technology from 2016 or stop paying before and after they terminated the Agreement.

Finally, Defendants' contention that they performed their obligations to set the royalty rates for 2016 and to pay such rates thereafter is belied by their course of conduct in their purported "negotiations" between November 2015 up to their notice of termination in February 2017, which demonstrated their intention to ignore their contractual obligations. Except for a lowball and unreasonable offer made in November 2015 that Defendants could not have believed Mitsuiya would accept, Defendants did not engage in negotiations. Despite unequivocal objections from Mitsuiya, Defendants unilaterally chose to pay the one percent royalty rate after it expired in December 2015 and stopped paying royalties from March 2017—two months before the effective date of termination. And, Defendants continued to misappropriate Technology thereafter. Therefore, by failing to set a mutually acceptable rate from 2016 (a material term), Defendants breached Section 2 of the AM and the RAM concession they received and per Section 3 of these agreements, the concession was rendered null and void.

Defendants are liable to Mitsuiya for the difference between the concession rate and a rate to be supplied by the factfinder determined based on parties' course of dealing (by reinstating Table 1) or based on a fair market value of Technology retrospectively to January 2014. Therefore, Defendants' request to dismiss Counts II and III under Rule 12(b)(6) must be rejected.  *Ajuba Int'l, L.L.C. v. Saharia*, *supra*.

**C.** **Mitsuiya's Claim that It is Contractually Entitled to Audit Defendants' Books Under Article 9 of the Agreement Should Not Be Dismissed**

Defendants' contention that Mitsuiya's right to audit Defendants' books and records, under Article 9 (DOC 23, Ex. A, PgID 462) of the Agreement, expired when the Agreement terminated on April 30, 2017 is baseless.

Under Maine law, contract provisions that are not expressly designated to survive termination nonetheless survive when they are vested. See *Johnson v. Polaris Sales, Inc.*, 257 F. Supp. 2d 300, 309 (D. Me. 2003)(quoting *Litton Fin. Printing Div., v. NLRB*, 501 U.S. 190, 207 (1991))("… Agreement reflects an intention to make the arbitration clause survive its termination. Rights asserted after the expiration of a contract may still attach where under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.")(quotations and citation omitted); *Maine Sch. Admin. Dist. No 68 v. Johnson Controls, Inc.*, 222 F. Supp. 2d 50, 53 (D. Me. 2002)("A claim brought after the expiration of a contract is found to 'arise under a contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested

under the agreement, or where under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.'"). See *S Bay Bos. Mgmt. v. Unite Here, Local 26*, 587 F.3d 35, 43 (1st Cir. 2009)("Contractual provisions relating to remedies and dispute resolution, such as an arbitration provision, often survive the termination of the contract in order to enforce duties arising under the contract. 'We presume as a matter of contract interpretation that the parties did not intend a pivotal dispute resolution provision to terminate for all purposes upon the expiration of the agreement.' This presumption may be negated 'expressly or by clear implication.'")(quotation and citation omitted).[9]

Mitsuiya's right to audit relates directly to its ability to ascertain whether there has been compliance with payment obligations under Article 8 of the Agreement; therefore, Mitsuiya's right to ensure such compliance through an audit did not expire with the Agreement's termination. Further, Mitsuiya's right under Article 9 did not require any actions by Mitsuiya to vest—by its own terms[10], this right vested during the

---

[9]   Michigan law is in accord.  See *Symyx Techs., Inc. v. Stargate Mobile LLC*, No. 06-12632, 2006 WL 2943301, at *2 (E.D. Mich. Oct. 13, 2006) ("Rights which accrued or vested under the agreement will, as a general rule, survive termination of the agreement."); *PFS Investments, Inc. v. Imhoff*, No. 11-10142, 2011 WL 1135538, at *8 (E.D. Mich. Mar. 25, 2011).

[10] Article 9 provides: "FFT hereby agrees to keep full, true and accurate records and books relating to the manufacture, assembly and sale of Produces and to permit a certified public accountant or other independent representatives, designated by MITSUIYA and acceptable to FFT, to examine such records and books of account during reasonable business and upon reasonable notice to the extent necessary to verify the accuracy of the royalty payments and statement required hereunder."

term of the Agreement. Moreover, pursuant to Article 17, no delay or omission to exercise a right or remedy provided in the Agreement (including the right to audit) shall waive that right or remedy. Mitsuiya's right to an audit is predicated on its entitlements that accrued prior to termination of the Agreement. Thus, Mitsuiya's right to demand an audit of Defendants' books and records survived termination and is enforceable.

### D. FFT Auburn, FFT Sidney and Conform Automotive are Bound by the Agreement, the AM and the FAM; Count IV Should Not Be Dismissed

Defendants seek to dismiss the contract claims against FFT Sidney, FFT Auburn and Conform Automotive ("Count IV Defendants") because they are nonsignatories to the Agreement, the AM and the RAM. Defendants' contention that Mitsuiya has not plead this claim sufficiently under the applicable is wrong and must be rejected.

First, only Michigan and/or Maine laws apply to this claim (not Delaware law[11]). With respect to Count IV claims, "[t]he rights and liabilities of the parties with respect to an issue in tort are determined by the *local law of the state which, with respect to that issue, has the most significant relationship to the occurrence* …." Restatement (Second) of Conflict of Laws § 145 (1971). Michigan and Maine have significant relationship with Mitsuiya's

---

[11] Defendants' cites to Delaware law are inapplicable. Although a number of the Defendants are Delaware entities, "the law of the state of incorporation is not entitled to preference on successor liability issues," therefore the court should apply the law of the state with the "most significant relationship" to the present dispute. *Chrysler Corp. v. Ford Motor Co.*, 972 F. Supp. 1097, 1103-4 (E.D. Mich. 1997) (rejecting application of the law of the state of incorporation); *LePine v. Rosenbaum*, No. 19-CV-12577, 2020 WL 2836275, *12 (E.D. Mich. June 1, 2020).

Count IV claims. From May 17, 2013, Executives made and implemented all material decisions with respect to the Defendants from the Headquarters in Michigan including the decisions to: form FFT Sidney and FFT Auburn by splitting FFT Technologies; register FFT Auburn and FFT Sidney to conduct business in Michigan; dissolve FFT Inc.; direct and participate in the negotiations for the compromise agreements with Mitsuiya; meet with Mitsuiya to discuss matters related to the Agreement; and omit to disclose material facts to Mitsuiya. Equally strong are Maine's relationship to this case: the agreements between parties "in all respects" are made subject to Maine law; FFT Inc., FFT Technologies, FFT Auburn, and their predecessor in interest (Gates) have had extensive history of conducting business in Maine; in April 2019, FFT Holdings operated from a post office box located in Maine; and FFT Sidney and Conform Automotive (f/k/a DTI), through common ownership and management, are alleged to be extensions of and/or alter egos of the Defendants with established connections in Maine; therefore, Maine law may also apply to Count IV. However, the analysis under either jurisdiction will result in the same conclusion that Count IV is plead sufficiently.

Second, Courts in Michigan and Maine recognize that nonsignatories may be bound to contracts through "ordinary contract and agency principles," which include theories of agency, estoppel, assumption and alter ego, among others. *Tobel v. AXA Equitable Live Ins. Co.*, No. 298129, 2012 WL 555801, *7-8 (Mich. Ct. App. Feb. 21, 2012) (noting multiple grounds for nonsignatory liability in Michigan and vacating district court denial of estoppel and incorporation by reference bases for nonsignatory

liability). See *iPayment, Inc. v. Goodrich*, No. CIV.A. CV-05-114, 2005 WL 2713727, *2-3 (Me. Super. July 11, 2005) ("a contract can bind a non-signatory where it was signed by the non-signatory's agent, or assigned to the non-signatory, or where the party who signed the contract is the 'alter ego' of the non-signatory.")

Third, while Michigan and Maine laws generally respect the separateness of related corporate entities, courts in both states will disregard the corporate form to prevent fraud, wrongful conduct or injustice. *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 111–12 (6th Cir. 1989); *Stanley v. Liberty*, 2015 ME 21, ¶¶ 27-29, 111 A.3d 663, 670 (2015). In Michigan, liability may be extended beyond the primary corporate operator where: "(1) the corporate entity to be disregarded was a mere instrumentality of another entity; (2) that this corporate entity was used to commit a fraud or wrong[12]; and (3) that the plaintiff suffered an unjust loss."[13] *Tredit Tire &*

---

[12] In *Kline v. Kline*, 104 Mich. App. 700, 305 N.W.2d 297 (1981), cited by Defendants, the Michigan Court of Appeals found that the mere fact that the defendant professional corporation was a "hybrid" corporation set up for two purposes was insufficient to support piercing absent finding that the interests of justice required such, it remanded the case for the lower court to make that determination. Despite finding the specific facts insufficient standing alone, the *Kline* Court expressly embraced the need to set aside the corporate form to reach an equitable result. "[When t]he fiction of a corporate entity … is invoked to subvert the ends of justice it should be and is disregarded by the courts." *Id.* at 702-3.

[13] Defendants do not address the unjust loss prong, and therefore concede it. Certainly it is unjust for Defendants to have continued to avail themselves of Mitsuiya's Technology and support which Mitsuiya understood it was providing pursuant to the Agreement, while failing to pay millions of dollars in royalties due to Mitsuiya and altering their corporate forms in an effort to render themselves judgment-proof.

[13] Defendants do not address the unjust loss prong, and therefore concede it. Certainly it is unjust for Defendants to have continued to avail themselves of Mitsuiya's

*Wheel Co., Inc. v. Regency Conversions, LLC, et al.,* 636 F. Supp. 2d 598, 601 (E.D. Mich. 2009) (citing *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,* 475 F.3d 783, 798 (6th Cir. 2007)). Maine similarly allows the corporate form to be set aside where: "(1) [defendant] abused the privilege of a separate corporate identity; and (2) an unjust or inequitable result would occur if the court recognized the separate corporate existence." *Stanley*, supra (piercing the corporate veil on contract claim upheld where alter ego finding was supported by evidence and it was "necessary in the interests of justice.").

Fourth, although the analysis of whether one entity has been used as an instrumentality of another is highly fact specific and must be evaluated under the particular circumstances of the case, pre-discovery dismissal is generally not appropriate. *Ypsilanti Cmty. Utilities Auth. v. Meadwestvaco Air Sys., LLC,* 678 F. Supp. 2d 553, 572–74 (E.D. Mich. 2009)(reaffirming decision on motion to dismiss that determination of defendant's alleged conduct that "would trigger veil piercing was more suited to summary judgment"); *Flagstar Bank, FSB v. S. Star Capital, LLC,* No. 13-CV-10290, 2014 WL 667966, *4 (E.D. Mich. Feb. 2, 2014)(denying motion to dismiss and noting that alter ego and veil piercing analysis is "fact-intensive" and that "discovery will properly define and refine the issues, which may then be amenable to summary judgment treatment."); *Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.,* 450 F. Supp. 2d

---

Technology and support which Mitsuiya understood it was providing pursuant to the Agreement, while failing to pay millions of dollars in royalties due to Mitsuiya and altering their corporate forms in an effort to render themselves judgment-proof.

757, 762 (E.D. Mich. 2006)("Whether in actuality Sun exerts the extensive dominion and control over Caraco alleged by Plaintiffs is a matter to be pursued through discovery."); *Chemtool v. Lubrication Technologies, Inc.*, 148 F.3d 742 746 (7th Cir. 1998)

Fifth, instrumentality and alter ego analysis must take into consideration the totality of the circumstances of a case and rest on any single factor. *Laborers' Pension Tr. Fund v. Sidney Weinberger Homes, Inc.*, 872 F.2d 702, 704–05 (6th Cir. 1988)(cited by Defendants).[14] In *Ickes v. Nexcare Health Sys., L.L.C.*, 178 F. Supp. 3d 578, 592–93 (E.D. Mich. 2016)(Berg, J.), this Court found, in denying a Rule 12(b)(6) motion to dismiss an alter ego claim:

> Alter ego liability is analyzed through the well-established factors of substantial identity of management, business purpose, operation, equipment, customers, supervision and ownership.  The record indicates that NexCare and Integrity shared common ownership operated out of the same building, and shared the same P.O. Box. While NexCare offered broader services than Integrity, who only offered rehab services, both companies served nursing homes. Therefore, although the record is not conclusive, Plaintiff has raised a question of fact as to whether NexCare and Integrity were alter egos.

---

[14] Nothing in *Laborers'* suggests that the facts alleged here are insufficient to support setting aside the separate corporate identities of the Alter Ego Defendants, particularly at this pre-discovery stage. In *Laborers',* the Michigan Court of Appeals *upheld* the lower court's determination that the Defendants *were* alter egos and explained: "[t]he defendant cites various cases which analyze one factor or another as being dispositive of the issue of piercing the corporate veil. However, none of these factors is a prerequisite to a finding that the corporate form has been violated." *Laborers'* at 705. *Laborers'* arose in the context of a post-discovery summary judgment motion by which point plaintiffs had obtained evidence establishing the undercapitalization of defendant corporation and inconsistent regard for various corporate formalities.

(citations and quotations omitted). Corporate veil of subsidiaries can be pierced to the parent when the corporations were managed by the same officers in the same office and were used as an instrument to avoid legal obligations by employing a "fraudulent shell game." *Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 873 F.2d 109, 111–12 (6th Cir. 1989). In sustaining a claim, court found that "[exercise] of control [by a parent corporation] of the contractual transaction [of a subsidiary] in a manner that defrauded and wronged [the plaintiff], who "suffered an unjust loss and injury" as a consequence of "affirmative representations and conduct" were sufficient to support alter ego liability by parent. *Ypsilanti Cmty*, supra at 572–4. A subsidiary's corporate veil can be pierced to its parent corporation when the parent transfers all of subsidiary's assets to the parent that leaves a contracting party of the subsidiary without any recourse.  *Servo Kinetics, Inc. supra* at 798-800.

Mitsuiya has sufficiently plead facts that allow this claim to go before the factfinder. From May 2013 until November 2016, Phillips and Vaughn were the controlling executives/owners, and from November 2016 with Colado, they were the controlling executives of Count IV Defendants and FFT Entities which they managed from the Headquarters in Michigan. ¶¶ 2-4, 6-8, 19, 59, 62-63, 66-72, 75, 311-312; PgID 312-315, 318, 331-335, 404-405. FFT Sydney and FFT Auburn's physical locations and manufacturing operations have not changed since the Agreement was first executed in 2004 when they were departments within FFT Technologies. ¶¶ 6-8; 76, PgID 314-315, 336. On or about April 2018, FFT Holdings, FFT Technologies, FFT Sidney and FFT

Inc. reported an office at P.O. Box 1300, Auburn, Maine. ¶¶81; PgID 337. In December 2013, Executives spun off their main assets—the manufacturing facilities that were receiving and using Mitsuiya's technology and support—shortly after Mitsuiya demanded collateral as security for Executives' promise to pay arrearages and future payments at a time when Defendants already owed $875,000 in delinquent royalties. ¶¶57, 74-77, 82-83, 116, 120; PgID 331, 335-336, 338, 347-348. To convince Mitsuiya to reduce its rates, Defendants represented that DTI had purchased FFT Inc. and provided it with financial support when in fact FFT Inc. was to be dissolved soon thereafter, and the manufacturing assets of FFT Technologies (where any support would have been needed) were transferred to FFT Auburn and FFT Sidney. ¶¶ 62-96; PgID 332-334.

Defendants have held themselves out individually and collectively as "Conform Automotive" for years. ¶¶3-4, 8, 62-69, 137, 322, 325; PgID 313, 315, 332-334, 354, 407-408. Defendants' website (¶69; PgID 334) describes "Conform Automotive" as "the only auto supply company that is vertically integrated from fiber to fabric to finished part" and as a "manufacturer." Those "parts" that Conform Automotive supplies and manufactures include the "textile wheel well liners" and "trunk liner" products manufactured in the Sydney and Auburn facilities using Mitsuiya's Technology. The Sydney and Auburn facilities are listed as Conform Automotive "locations" and Conform's customer list includes Toyota without any differentiation

among the entities and there is none. ¶¶68-69; PgID 333-334.[15] Through these machinations, Executives persuaded Mitsuiya to allow the Defendants to continue to use the Technology at a substantially reduce rate and to continue to take advantage of Mitsuiya's technical support while presenting the entities as a single business. ¶¶63, 130-138, PgID 332, 352-354. Executives did not intend to honor their obligations under the AM/RAM as clearly demonstrated from their corporate shell games, delay tactics to negotiate new rates and termination of the Agreement as soon as the sale of Defendants to Gissing Automotive closed. For its part, after the sale closed, Executives approved and endorsed Count IV Defendants that had obtained the Technology through FFT Entities to misappropriate the Technology after they had terminated the Agreement. ¶¶154-188; PgID 359-369. The harms perpetrated by Count IV Defendants were facilitated by the fact that the management, business purpose, operation, equipment, customers, headquarters and ownership of the Defendant contract signatories, FFT Inc. and FFT Technologies, and the assignee FFT Holdings significantly overlap with and/or are identical to those of the Count IV Defendants.  See FAC citations in this section and supra.

Defendants arguments are legally unpersuasive. First, contrary to their contention, fraud is not a required element for piercing corporate veil to find alter ego liability. Repeatedly, Michigan Supreme Court has recognized that the corporate veil can be

---

[15] *See* http://www.conformgroup.com/about-us, www.conformgroup.com/product, and www.conformgroup.com/customers each last accessed 7/23/2020.

pierced in the absence of fraud. *Ypsilanti Cmty.*, supra at 572–74 (citing and quoting

*Papo v. Aglo Restaurants,* 149 Mich. App. 285, 302 n. 15 (1986); *Arbo v. Tower Group, Inc.*,

2018 Me. Super. LEXIS 198 (Me. Super. Dec. 4, 2018)(finding a *prima facie* case for alter

ego liability and noting that the "inequitable result" prong "does not require a finding

of fraud or illegality.") However, the FAC pleads sufficient facts even to support claims

for fraudulent misrepresentation and/or inducement.[16] Next, their contention that to

withstand dismissal, a complaint must plead sufficient facts to raise a "plausible

---

[16] Defendants' remaining cases are readily distinguishable: (1) the instrumentality allegations therein were minimal and conclusory, (2) there was nothing wrong or unjust found therein, and/or (3) they arose in a completely distinct context. *Johnson Elec. N. Am., Inc. v. Daimay N. Am. Automotive, Inc.,* 2020 WL 1531727 (E.D. Mich. Mar. 31, 2020)(contract claim dismissed where complaint consisted of conclusory allegations unsupported by exhibits and only two very limited interactions between plaintiff and employee of putative alter ego); *Seasword v. Hilti, Inc.,* 449 Mich. 542 (1995)(alter ego not established without allegations that corporate form was abused); *Nogueras v. Maisel & Assocs. of Mich.*, 369 N.W.2d 492 (after *trial,* appellate court upheld the trial determination that alter ego liability had not been established where there was "no evidence" that defendants were instrumentalities and there was no unjust loss in the payment of an "admittedly reasonable fee" for services rendered); *Dept. of Consumer Indus. Servs. v. Shah,* 236 Mich. App. 381 (1999) (sole proprietor's 100% ownership alone was insufficient where interest of justice did not require piercing); *Wells v. Firestone,* 42 Mich. 641 (1984) (applying the "economic reality test" to determine which entity was the real employer for liability purposes where employee was injured on the job); *Wodogaza v. H & R Terminals, Inc.*, 161 Mich. App. 746 (1987); *In re. RCS Eng'red Prods. Co.*, 102 F.3d 223, 226-7 (6th Cir. 1996)(a subsidiary may not bring an alter ego claim against its own parent). Indeed, another case cited by Defendants *supports* liability for the Count IV Defendants under facts similar to those here. *Herman v. Mobile Homes Corp.*, 317 Mich. 233 (1947)(subsidiaries were deemed to be "mere departments" of parent where *inter alia* all supplies were purchased from the parent, there was overlap and close relationship between the officers and directors of the entities, the entities were managed together out of a common address.)

inference of wrongdoing" and that "naked assertions" are insufficient and equally unpersuasive.[17] Then, Defendants' claim that the FAC only pleads "common ownership" to assert a claim for alter ego liability is simply false. And, finally, nowhere do Defendants meaningfully address the myriad of relevant facts as alleged in the FAC, nor contradict the picture of the interwoven deceptions, interwoven relationships, and interwoven use of entities as instrumentalities and vehicles set forth in the FAC in detail.

The questions of the relationship between the parties, and their complicity with each other, are not issues for a motion to dismiss, given that Mitsuiya's allegations as a whole, not in isolation, are to be taken as true. Such allegations, taken together, sufficiently support Count IV liability, especially at this early stage in the litigation. The FAC describes a rearranging of corporate entities and assets with the intent to continue to take advantage of Mitsuiya Technology while leaving a shell entity as the contracting

---

[17] "Plausibility" is not a high standard. As Defendants' case, *16630 Southfield Ltd. Partnership v. Flagstar Bank, F.S.B.*, explains: "plausibility depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." 727 F.3d 502, 504 (2013)(dismissing claim of discrimination based on conclusory allegations of prejudice against Muslims post 9/11, where bank had an "obvious alternative explanation" at the height of the 2008 financial crisis for denying the loan in light of plaintiff's prior repayment failure). Unlike the bank in the *16630 Southfield* case, Defendants here offer no alternative explanation for their conduct and even had they one "the mere existence of more likely alternative explanations does not automatically entitle a defendant to dismissal." *Id.* at 505. Similarly, in *Llewellyn-Jones v. Metro Property Grp., LLC,* 22 F. Supp. 3d 760 (E.D. Mich. 2014), dismissal was granted where, other than alleging common ownership, Plaintiff merely recited alter ego factors without providing any specifics that would support a "plausible inference of wrongdoing." Such is not the case here.

party and moving the assets into new entities; therefore, Defendants' motion to dismiss this Count IV must be denied.

E. **Mitsuiya States a Cognizable Claim of Unjust Enrichment in Count V**

Defendants seek dismissal of Count V contending (i) unjust enrichment is preempted by the misappropriation of trade secret claims against any Defendants, and (ii) because the Agreement is effective between FFT Inc., FFT Technologies and FFT Holdings, Mitsuiya cannot maintain an unjust enrichment claim against these three Defendants. Defendants are mistaken on both points.

Mitsuiya asserted claims under the federal and state trade misappropriation statutes since its Technology constitutes "trade secrets" within the definition of those statutes. However, the wrongs visited on Mitsuiya by Defendants were not limited to theft of trade secrets; Mitsuiya also provided proprietary sales knowhow, marketing information and strategy to prepare presentation papers to enable Defendants to win valuable contracts from Toyota based on which to this day they are making substantial profits. ¶¶43-44; PgID 327-28. At all times prior to the termination of the Agreement on April 30, 2017. Mitsuiya's engineers and executives provided substantial assistance to one or more Defendants (except Gissing Automotive) to assist them in negotiation of agreements with Toyota. ¶108; PgID 345-346. They also provided support and training to Defendants' engineering and production employees. Mitsuiya did not assert a claim of misappropriation under the applicable trade secret statutes for Defendants' use of its sales knowhow and marketing information and strategy provided to

Defendants since these may not qualify as a trade secret under the definitions provided in the Defend Trade Secrets Act (18 U.S.C. § 1836 *et seq.*): the Michigan Trade Secrets Act (MCL § 445.1901); and/or the Maine Trade Secrets Act (10 M.R.S. §1542).

To the extent that any or all of the Defendants utilized Mitsuiya's sales knowhow and marketing information and strategy outside of their contractual entitlements, and/or this information does not fall within the definition of "trade secret" under those statutes, such that Mitsuiya's claims are not subsumed into other counts of the complaint, Mitsuiya can assert a claim of unjust enrichment against Defendants. See *Oldnar Corp. v. Panasonic Corp. of N. Am.*, 766 F. App'x 255, 268 (6th Cir. 2019) ("On remand, the district court is to determine whether Nartron's alleged 'know-how' satisfies MUTSA's definition of 'trade secret.' In determining if the 'know-how' satisfies the definition, the court is also to consider the parties' relevant agreements. *See Planet Bingo v. VKGS, LLC,* 900 N.W.2d 680, 684-85, 688 (Mich. App. 2017). If the 'know-how' falls in the definition of trade secret under MUTSA, then the unjust enrichment claims would be displaced by MUTSA and should be dismissed. If the 'know-how' falls outside the trade secret definition, then MUTSA is no bar to Nartron's recovery.").

Mitsuiya's unjust enrichment claims are specifically plead in the alternative, such that if liability cannot attach under another theory, Mitsuiya may be entitled to equitable recovery at trial if the facts, as developed during discovery and presented to the finder of fact, warrant such recovery. *Cascade Elec. Co. v. Rice*, 70 Mich. App. 420, 426-27, 245 N.W.2d 774, 777 (1976). Accordingly, Count V of the FAC should not be dismissed.

F.  **Defendants' Motion to Strike Should Be Denied**

Defendants' request under Fed. R. Civ. P. 12(f) to strike certain allegations of the FAC as "redundant, immaterial, impertinent, or scandalous" should be denied. A motion to strike must be denied unless the challenged allegations *have no possible relation or logical connection to the subject matter of the controversy* and may cause some form of significant prejudice to one or more of the parties to the action.  See *Brown & Williamson Tobacco Corp. v. United States*, 201 F.2d 819, 822 (6th Cir. 1953)("…[B]ecause of the practical difficulty of deciding cases without a factual record it is well established that the action of striking a pleading should be sparingly used by the courts. It is a drastic remedy to be resorted to only when required for the purposes of justice. The motion to strike should be granted only when the pleading to be stricken has no possible relation to the controversy."); *House of Providence v. Meyers*, No. 19-CV-13424, 2020 WL 2131800, *19 (E.D. Mich. May 5, 2020)("Rule 12(f) motions are viewed with disfavor and are not frequently granted.")(citation omitted); *Sherrills v. Wilson*, No. 1:05-CV-310, 2005 WL 1711132, at *1 (W.D. Mich. July 21, 2005)("…[M]otion to strike allegedly offensive matter also will be denied if the allegations might serve to achieve a better understanding of the plaintiff's claim for relief.") See also Wright & Miller, Federal Practice and Procedure: Civil 3d § 1380 (motion to strike is frequently denied where a party is not prejudiced from words use even if offending literally); and Civil 3d § 1381. (Absent "compelling evidence of prejudice or irrelevancy," a motion to strike has no merits.)

Mitsuiya's allegations sufficiently support the conclusions expressed in each of the phrases Defendants seek to strike from the FAC. Defendants fail to present any facts that demonstrate compelling evidence of prejudice or irrelevancy, much less stating with particularity the grounds therefor. They baldly make the off-hand remark that the numerous paragraphs they seek to strike are "designed to intimidate and damage Defendants and the reputations of their corporate executives," without any further discussion or elaboration.[18] Virtually all of the specific paragraphs that Defendants seek to strike (other than the narrative statement at the beginning of the FAC, discussed below) relate to stated allegations of fraudulent and deceptive conduct. Defendants do not present compelling evidence that the challenged allegations have no possible relation or logical connection to the subject matter of the controversy. The challenged allegations in this case support claims, theories, elements and issues related, but not limited to, trade secret misappropriation, alter ego liability, estoppel, unjust enrichment, and breach which take into consideration the deceptive, fraudulent and wrongful acts and omissions of Defendants as alleged throughout the FAC: without notifying Mitsuiya, Defendant entities were bought and sold; Executives dissolved and split Defendant entities and transferred assets out of Mitsuiya's reach; Executives represented major restructurings had minor impact on Mitsuiya; introduced FFT

---

[18] A party may not merely announce his position and expect the court to discover and rationalize the basis for his claims. *Clark v. Brewer*, 2018 WL 1927384, *10 (E.D. Mich. April 24, 2018); *Cloud v. Berghuis*, 2007 WL 2363317, *7 (W.D. Mich. Aug. 16, 2007).

Technologies as FFT Inc. with a new name; and categorized major substantive contract revisions as minor revisions. The Technology was passed around between Defendants without disclosing the transfers/assignments to Mitsuiya.

Defendants attack the use of un-numbered "Nature of Action" paragraphs at the beginning of the FAC. Notwithstanding the language of Rule 10(b), requiring averments be stated in numbered paragraphs, failure to comply with this provision is actionable only if it results in prejudice or difficulty to the responder.  "However, '[b]ecause the motion to direct a party to paragraph a pleading properly often is employed only as a dilatory tactic, a district court should direct a pleader to paragraph only when the existing form of the pleading is prejudicial or renders the framing of an appropriate response extremely difficult.' Wright and Miller, Federal Practice and Procedure: Civil 3d § 1322." *Sherrills*, supra at *3.  Notably, Defendants fail to articulate how Rule 10(b) is to be applied, have cited no other authority for their demand to strike the "Nature of Action" section, and fail to explain how they are so prejudiced as to justify striking of these paragraphs. Indeed, Defendants did not object to or seek to strike these unnumbered averments when moving to dismiss (DOC 9, PgID 194-247) the Complaint (DOC 1) which underscores the lack of harm or prejudice to Defendants. Consequently, the motion to strike should be denied or Mitsuiya should be granted leave to amend the pleadings to number the allegations at issue.

### G. **Mitsuiya Should be Granted Leave to Amend**

If any claims are dismissed, Mitsuiya should be granted leave to amend its

pleading. "Under Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a pleading should be freely given when justice so requires. The purpose of Rule 15(a) is to reinforce the principle that cases should be tried on their merits rather than the technicalities of pleadings." *Greenberg v. Life Ins. Co. of Virginia*, 177 F.3d 507, 522 (6th Cir. 1999)(quotations marks and citations omitted). "The court should freely give leave when justice so requires. In exercising its discretion concerning whether to allow an amendment, "the court should consider the delay in filing, the lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of the amendment." *Kittle v. Am.'s Test Kitchen LP*, No. 2:19-CV-11757, 2019 WL 6496596, at *1 (E.D. Mich. Dec. 3, 2019)(Berg, J.)(quotation marks and citations omitted).

## <u>CONCLUSION</u>

For the foregoing reasons, Mitsuiya respectfully submits that the Court should deny the Motion to Dismiss and to Strike in its entirety.

FLORENCE ROSTAMI LAW, LLC

*/s/ Florence Rostami*
Florence Rostami
Neal M. Haber
Attorneys for Plaintiff

DAWDA, MANN, MULCAHY & SADLER, PLC

*/s/ John Mucha, III*
John Mucha, III (P40907)
Co-Counsel for Plaintiff

IZOWER FELDMAN, LLP

*/s/ Rachel Izower-Fadde*
Rachel Izower-Fadde
Co-Counsel for Plaintiff

Dated: July 23, 2020

35

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| **MITSUIYA INDUSTRIES, CO. LTD.,** | |
| *Plaintiffs,* | **CASE NO. 2:20-cv-10941-TGB-TSW** |
| v. | |
| **FORMED FIBER TECHNOLOGIES, INC.; GISSING TECHNOLOGIES, LLC f/k/a FORMED FIBER TECHNOLOGIES, LLC; GISSING NORTH AMERICA, LLC f/k/a CONFORM GISSING INTERNATIONAL, LLC f/k/a FFT HOLDINGS, LLC; GISSING AUTOMOTIVE SYSTEMS, LLC; GISSING SIDNEY LLC f/k/a FFT SIDNEY LLC; GISSING AUBURN LLC f/k/a FFT AUBURN LLC; CONFORM AUTOMOTIVE, LLC; JOHN DOE ENTITIES AND/OR INDIVIDUALS 1-10,** | **HON. TERRENCE G. BERG** |
| *Defendants.* | |

## CERTIFICATE OF SERVICE

DEBRA D. JAWORSKI states that she is employed by the law firm of Dawda, Mann, Mulcahy & Sadler, PLC, and on July 23, 2020, she electronically filed with the Court, the following:

1. Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss the First Amended Complaint in Part and To Strike;

2. Appendix/Exhibits (with Exhibits A, and 1–15); and

3. This Certificate of Service

and that the Court's electronic filing system will send notice of said electronic filing of each of the documents identified above to counsel and parties of record.  Parties may access this filing through the Court's system.

_/s/ Debra D. Jaworski_
DEBRA D. JAWORSKI